### SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

### Thomas WARDE, Defendant–Appellant.

### No. 97–6190.

United States Court of Appeals, Second Circuit.

Argued March 17, 1998.

Decided July 8, 1998.

Katharine B. Gresham, Washington, D.C. (Richard H. Walker, General Counsel, Jacob H. Stillman, Catherine A. Broderick and Rada L. Potts, Assistant General Counsels, and Paul Gonson, Solicitor, Securities and Exchange Commission, Washington, D.C., Of Counsel) for Plaintiff-Appellee.

Thomas P. Puccio, New York City (Paul F. Corcoran, Jennifer Tafet Klausner and Andrew D. Herz, Davis & Gilbert, New York City, Of Counsel), for Defendant-Appellant.

Before: JACOBS, LEVAL and GIBSON,* Circuit Judges.

* The Honorable John R. Gibson, United States Court of Appeals for the Eighth Circuit, sitting by designation.

LEVAL, Circuit Judge:

Thomas Warde appeals from a final judgment of the United States District Court for the Southern District of New York (Shira Scheindlin, District Judge) holding him liable, in a civil enforcement proceeding, for violating §§ 10(b) and 14(e) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78j(b) and 78n(e), and Rules 10b–5 and 14e–3 promulgated thereunder. *Securities and Exchange Commission v. Downe*, 969 F.Supp. 149 (S.D.N.Y.1997). Warde raises numerous objections to the conduct of the trial and the judgment below. We reject each contention and affirm the district court in all respects.

## Background

The evidence showed that Warde was a good friend of Edward Downe. Both were active stock market investors. Downe in turn was a close friend of Fred Sullivan, Chairman of Kidde, Inc. ("Kidde"). Kidde is a conglomerate valued at over $1.5 billion. Downe and Sullivan both had houses in the Hamptons on Long Island, New York, and Sullivan was a frequent guest at Downe's house. At Sullivan's request, Downe had become a director of Kidde in 1986. Sullivan kept the Kidde directors regularly informed of developments at Kidde.

Throughout the spring of 1987, reports and rumors in the financial community suggested that Kidde's high break-up value relative to its share price made it a likely takeover target. On June 3, the Kidde board met. The next day, Sullivan retained the investment banking firm of Bear, Stearns & Co. to discuss restructuring options as a defense against a takeover. During the next two weeks, the price of Kidde shares rose from $34 to $41 on increasingly heavy volume. On June 17th, Bear, Stearns suggested in a confidential report that management could acquire Kidde by paying shareholders about $45 per share.

By Monday, June 22, Sullivan had learned that an undisclosed British buyer was accumulating Kidde shares. Press reports that week indicated that Kidde was "in play". On Sunday morning, June 28, Sullivan met with investment bankers at his house on Long Island to respond to takeover developments. Visibly depressed, Sullivan visited Downe at Downe's house later that afternoon.

On Monday, June 29, Sullivan learned from his lawyers that the accumulating buyer was Hanson Trust PLC ("Hanson"), a large British conglomerate. Hoping to expand Kidde's range of options in the face of Hanson's apparent takeover bid, Sullivan opened negotiations with several suitors during that week and began to contact the board of directors (including Downe) to organize an emergency meeting immediately following the July 4th weekend. On July 6, Sullivan met with the CEO of Hanson; the next day, the Kidde board convened to discuss the Hanson initiative as well as a buyout inquiry from Kohlberg Kravis Roberts ("KKR"), and the possibility of a leveraged buyout by management. Downe, who was in Sun Valley, Idaho, participated in the meeting by telephone. On July 7, Kidde issued a press release announcing that it had formally retained investment advisors and was actively engaged with two companies in discussions regarding a possible sale of all or a substantial portion of Kidde. On this news Kidde shares rose precipitously; the price of Kidde warrants jumped 55 percent from $14 to $21.63.

At the end of July, KKR and Hanson submitted competing offers to purchase Kidde. The Kidde board voted to accept the Hanson offer on August 3. The merger agreement was signed on August 4, and the companies announced the agreement—which included a tender offer for Kidde shares—in a joint press release issued on August 5. As the result of these events, Kidde stock rose from $34 at the beginning of June to about $66 on August 5. Warrants priced at $1 on June 5 and at $7.50–$9.25 on June 29 went to $26.50 on August 5.

While these events were unfolding, Downe and Warde each made substantial purchases of warrants to buy Kidde stock and earned

very large profits.[1] On June 4, the day after the meeting of the Kidde board and simultaneously with Kidde's hiring of Bear, Stearns, Downe purchased 5,500 warrants for his son through an offshore account at a price of about $1 per warrant. Downe sold these warrants two weeks later (together with additional warrants he purchased for himself, family members and friends) for about $4 per warrant, realizing a profit of over 300 percent.

On Monday, June 29, after spending time with Sullivan the previous evening, Downe began to purchase warrants again in much larger quantities at prices of approximately $8 to $9. Downe rapidly invested $268,000. After talking with Downe by telephone, Warde invested $350,000 in Kidde warrants on June 29 and 30.

Downe and Warde spoke together the following weekend about Kidde. The following Monday, July 6, the day before Kidde's public announcement that made its stock soar, Downe (borrowing $1 million from his wife) invested an additional $2 million in warrants, and Warde added approximately $460,000 to his investment. Warde's investments appreciated by $866,000 that day, and Downe's by $3,012,000.

On July 20, after Downe had participated in meetings of Kidde's board discussing the evolving competition for Kidde stock, he spoke by telephone with Warde. That day Warde invested an additional $200,000 to purchase warrants at about $22. During the next three days, Downe invested another $1.8 million in warrants at similar prices. A. 815. Warde and Downe ultimately earned profits of about $33,000 and $349,000, respectively, on this final wave of purchases.

In 1992, the Securities and Exchange Commission ("SEC" or "the Commission") filed a complaint against Warde and Downe, among others, alleging insider trading in violation of §§ 10(b) and 14(e) of the 1934 Act and Rules 10b–5 and 14e–3 promulgated, respectively, thereunder. Downe settled with the Commission; the case against Warde reached trial in 1997.

The Commission contended that Warde's investments in Kidde warrants were made with the benefit of Kidde's non-public information about competing bids to acquire the company—information that Downe had obtained as a Kidde director and passed on to Warde. Warde denied possession of any non-public information. He and Downe (who was called as a witness in Warde's trial) each testified that their purchases were based on market savvy, rumor and public information alone. Warde denied having received any confidential information regarding Kidde from Downe.

At the close of evidence, Warde moved for judgment as a matter of law, claiming that the Commission's wholly circumstantial case failed to provide an evidentiary basis for liability. Judge Scheindlin denied the motion, and the jury found Warde liable. The final judgment permanently enjoined Warde from securities trading violations and ordered him to disgorge some $872,000 in profits, pay a civil penalty in the same amount, and disgorge $1.26 million in prejudgment interest.

### Discussion

1. *Sufficiency of the Evidence.* Warde's principal challenge on appeal is to the sufficiency of the Commission's evidence. He contends the Commission's case was based entirely on guilt by association and "thin pieces of circumstantial evidence," which, in the aggregate, were insufficient to support the jury's finding of liability under §§ 10(b) and 14(e) of the 1934 Act. We will overturn a jury's verdict in favor of a plaintiff if the evidence supporting the verdict, viewed in the light most favorable to the plaintiff, is insufficient to support a reasonable finding in plaintiff's favor. The test is the same as it would be if the question were whether the case should have been permitted to go to the jury.

---

1. Warde and Downe did not purchase Kidde shares but instead invested in a more highly leveraged fashion, by purchasing warrants to buy Kidde shares at $40. The warrants expired on December 16. Had Kidde's share price failed to exceed $40 during the life of the warrant, or fallen back below $40 before the warrants were exercised, the investments Warde and Downe made would have become worthless.

■ To affirm Warde's liability as a tippee under § 10(b), we must find sufficient evidence to permit a reasonable finding that (1) Downe possessed material, nonpublic information regarding Kidde; (2) Downe disclosed this information to Warde; (3) Warde traded in Kidde warrants while in possession of that non-public information provided by Downe; (4) Warde knew or should have known that Downe violated a relationship of trust by relaying Kidde information; and (5) Downe benefitted by the disclosure to Warde. *See Dirks v. SEC*, 463 U.S. 646, 654–64, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). To uphold the jury's finding of § 14(e) liability, we must also find evidence that a "substantial step" had been taken toward a tender offer at the time of the inside trading, but there is no requirement to show that Downe breached a fiduciary duty. *See United States v. Chestman*, 947 F.2d 551, 557, 563 (2d Cir.1991) (in banc). We conclude that the SEC presented evidence sufficient to support each of these elements.

■ a. *Downe's Possession of Nonpublic Information.* There was ample evidence that Downe possessed nonpublic information regarding the threat of a takeover of Kidde. Downe was a director of Kidde. His friend Sullivan, the CEO of Kidde, kept the directors informed on the takeover developments, and Downe attended meetings of the board in which the developing situation and Kidde's strategy were discussed.

The inference that Downe traded on inside information was reinforced by the manner in which Downe made his purchases. Downe did not make any of the purchases in his own name. The purchases he made for himself were executed through a Bermuda account in the name of Broadsword Limited. In addition, he acknowledged that he took further steps to conceal the purchases—including failing to file the required Form 4 report disclosing directors' transactions in the stock of their companies; failing to report the profits on his income tax returns; and not telling his friend Sullivan, the CEO of Kidde, of his highly profitable transactions in Kidde securities.

This evidence amply supports a jury finding that Downe was in possession of, and traded upon, inside information.

■ b. *Materiality.* The materiality of Downe's information is also not open to doubt. Information is material if "there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest]." *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The facts that Hanson was accumulating Kidde stock and contemplating a tender offer, that KKR was also interested in bidding for Kidde, and that management was contemplating a leveraged buyout to fend off the unwelcome bids had a very high likelihood of affecting the price of Kidde's stock, as confirmed by the fact that the stock price jumped when this information was made public. The evidence was clearly sufficient to support the jury's conclusion that this inside information was material.

■ c. *Disclosure of the Information to Warde.* Warde also challenges the Commission's evidence that Downe transferred to him any nonpublic information, material or otherwise. While Warde acknowledges that the two men discussed Kidde's prospects, he maintains that the conversations were limited to public information, especially the views of other investors.

The Commission presented ample circumstantial evidence to support the jury finding to the contrary. The Commission's evidence demonstrated a pattern in which Downe received nonpublic information, then communicated with Warde, and then both Warde and Downe purchased Kidde warrants. More specifically, the SEC showed that Downe and Warde spoke (1) by telephone shortly after Downe spoke with Sullivan on Saturday, June 27, after Sullivan had arranged the extraordinary meeting of investment banking consultants for the next morning; (2) by telephone on June 28, after the investment banker meeting and after Sullivan visited Downe, visibly distressed (and just before Warde began buying Kidde warrants); (3) while spending time together the weekend immediately prior to the July 7 announcement of merger talks and after Downe was contacted to attend the July 7 emergency

board meeting—and immediately prior to substantial purchases of Kidde warrants by Warde and Downe; (4) by telephone on July 20, shortly before both men increased their positions in Kidde warrants. This pattern supports the inference that Downe communicated inside information to Warde, who in turn traded upon it.

The parallel trading of Warde and Downe further supports that inference. Downe and Warde engaged in uncharacteristic, substantial and exceedingly risky investments in Kidde warrants shortly after speaking with one another, suggesting that they discussed not only the inside information, but also the best way to profit from it. The investments both made were in warrants, expiring in six months, to purchase Kidde stock at $40 a share. At the beginning of June, Kidde stock was trading at $34 a share. Under the circumstances, the warrants would be of very little value unless the Kidde stock soon rose above $40 per share.

Accordingly, in early June, when Downe first invested in them, the warrants were trading at less than $1. Less than two weeks later Downe sold all the warrants he had acquired, making a very sizeable profit. Nonetheless, within ten days, Downe began to purchase more warrants, in much larger quantities, now paying prices 7 to 10 times what he had paid less than a month earlier. A week later on July 6th, just before Kidde made its first public announcement, Downe bought $2 million worth of the warrants, now paying 11 to 14 times what he had paid one month before. And in late July he borrowed to invest $1.8 million in warrants, now at prices more than 22 times what the warrants had been worth than in the beginning of June. Downe acknowledged that this was his heaviest investment of the year. While Downe claimed to have made the investments on the basis of rumors, it seems clear that if the takeover rumor had not materialized, or if the Kidde stock for whatever reason had fallen back to $40, Downe would have lost almost all of his investment.

The same was true of Warde, who first purchased on June 29. The Kidde stock had passed $40 (the exercise price) only 10 days before and Warde paid for the warrants sev-en times what they had traded for two weeks before. Like Downe, he continued to buy in the next week as the warrant price rose, even though the security would lose almost all its value if in the next months the Kidde stock sank back to $40. Warde purchased heavily on margin, and his stake in Kidde far exceeded his customary risk tolerance.

Under the circumstances we have no doubt the evidence was sufficient to support a jury finding that Warde relied on inside information gathered from Downe, and not on rumor as he claimed.

■ d. *Warde's Knowledge of Violation of Trust.* Warde next disputes the sufficiency of the evidence to sustain the jury's finding that Warde knew or should have known that Downe was a Kidde director and thus violated a trust by relaying inside information.

The claim is meritless. The SEC showed that Downe and Warde were good friends who often discussed their business and investing interests, and that Warde habitually discovered who was on the board of directors of a company before investing in it. While this evidence does not compel the conclusion that Warde knew Downe was a Kidde director, it certainly allows that inference. The jury could thus reasonably find that Warde knew or should have known that Downe stood in a position of trust with respect to Kidde.

■ e. *Benefit to Tipper.* Warde also claims that the SEC provided no evidence that Downe benefitted from Warde's trades, precluding liability under § 10(b) and Rule 10(b)–5. However, the Supreme Court has made plain that to prove a § 10(b) violation, the SEC need not show that the tipper expected or received a specific or tangible benefit in exchange for the tip. *See Dirks v. SEC,* 463 U.S. at 664, 103 S.Ct. 3255. Rather, the "benefit" element of § 10(b) is satisfied when the tipper "intend[s] to benefit the ... recipient" or "makes a gift of confidential information to a trading relative or friend." *Id.* at 664, 103 S.Ct. 3255.

Under this standard, Downe clearly benefitted from Warde's inside trades. Warde's trades "resemble[d] trading by the insider

himself followed by a gift of the profits to the recipient." *Id.* The close friendship between Downe and Warde suggests that Downe's tip was "inten[ded] to benefit" Warde, and therefore allows a jury finding that Downe's tip breached a duty under § 10(b).

■ f. *"Substantial Step"*. Finally, Warde argues that insufficient evidence existed to find that a "substantial step" had been taken toward a tender offer at the time of the inside trading, as required for liability under Rule 14e–3. 17 C.F.R. § 240.14e–3(a). By June 29, when Warde first invested in Kidde warrants, Hanson had acquired a large position in Kidde from which to launch a tender offer. Sullivan, meanwhile, had already convened an emergency meeting with his investment bankers and arranged for legal counsel to mount a defense to the takeover, which contemplated a tender offer by Kidde management. These developments qualify as "substantial steps" within our decisions.

The "substantial step" requirement is still more comfortably satisfied regarding Warde's subsequent trades, which occurred contemporaneous with or after Sullivan's meeting with the CEO of Hanson and therefore clearly fall under § 14(e). *See SEC v. Mayhew*, 121 F.3d 44, 53 (2d Cir.1997)(citing *Camelot Industries Corp. v. Vista Resources, Inc.*, 535 F.Supp. 1174, 1183 (S.D.N.Y.1982))(meeting between officers of merging firms is a substantial step).

We therefore conclude that the SEC presented sufficient evidence to support every jury finding necessary to hold Warde liable under §§ 10(b) and 14(e) of the 1934 Act.

■ 2. *Admission of Evidence.* Warde claims that the district court abused its discretion by allowing the SEC to introduce evidence that Downe illegally attempted to conceal his trading in Kidde stock by using offshore accounts and accounts of others. Warde contends that Downe's deceptive behavior in trading in Kidde shares is fully explained by his desire to avoid the short-swing insider profit rule and added nothing to the SEC's case against Warde. Because the evidence risked to condemn Warde by association in the eyes of jurors, Warde argues, its minimal relevance was outweighed by the potential for unfair prejudice and should have been excluded under Fed. R.Evid. 403.

We disagree. Downe's resort to deceptive trading practices supports the inference that he was trading illegally on inside information. While Downe may have intended to conceal his Kidde trades to avoid the bar on short-swing insider profits, his deceptive conduct is also consistent with, and admissible to demonstrate, a desire to avoid insider trading liability. There was no abuse in the district judge's decision to admit the evidence of Downe's concealed trading.

■ 3. *Disgorgement of Profits.* Warde raises two objections to the district court's order that he disgorge $872,000 in profits from his Kidde trades. We review the district court's disgorgement order for abuse of discretion. *See SEC v. Posner*, 16 F.3d 520, 522 (2d Cir.1994).

■ Warde first argues that $339,000 of his profits were attributable to third parties, and so disgorgement of those sums would impermissibly operate as a penalty rather than release of unjust gains. The third parties for whom Warde purchased shares were the Warde Trust and Ann Brockhurst. As the district court observed, neither "are truly third parties." Warde is the sole present beneficiary of the Warde Trust, which passes to Warde's offspring upon his death. Ann Brockhurst is Warde's wife; Warde himself opened the account through which he traded on her behalf on July 1 and exercised complete control over the account.

Moreover, even if the Brockhurst and Warde Trust profits were fairly characterized as third party profits, Warde would nevertheless be liable to disgorge their profits. A tippee's gains are attributable to the tipper, regardless whether benefit accrues to the tipper. The value of the rule in preventing misuse of insider information would be virtually nullified if those in possession of such information, although prohibited from trading for their own accounts, were free to use the inside information on trades to benefit their families, friends, and business associ-

ates. *See SEC v. Clark,* 915 F.2d 439, 454 (9th Cir.1990).

 Warde next contends that $191,000 of his profit was attributable to price increases before the July 7 disclosure that Kidde was in merger negotiations and was thus unconnected to the release of previously non-public information.

Warde's argument seems to us wholly unpersuasive. On June 29, when Warde first purchased Kidde warrants on the basis of illegal inside information about bidders to take over Kidde, he had to pay approximately $9 per warrant. The public release on July 7 of confirmation that there were efforts to take over Kidde drove the warrant price to approximately $22. Thus, Warde's inside information permitted him to buy at $9 a security that would soon be worth $22. How much of the intervening increase—all attributable to the prospect of the takeover bid concerning which Warde had inside information—occurred before, and how much after, the public announcement seems to us irrelevant. Warde's possession of the inside information gave him a decided and unfair advantage over those who sold in ignorance of this information and those who made speculative purchases based on unconfirmed rumors. The insider trading rules seek to prevent and take the profit out of such trading.

In any event, "[d]isgorgement need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Patel,* 61 F.3d 137, 139 (2d Cir.1995) (citation omitted). So long as the measure of disgorgement is reasonable, "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* at 140 (citation omitted). The district court reasonably fixed disgorgement as the difference between the price of Warde's Kidde warrants when purchased on inside information and their price after the disclosure of the inside information. Of course, Warde was entitled to prove that the district court's measure is inaccurate, *see SEC v. Bilzerian,* 29 F.3d 689, 697 (D.C.Cir.1994), but the fact that some of the increase preceded the public announcement does not show that Warde did not benefit from inside information. There

was no error in the calculation of disgorgement, still less abuse.

4. *Prejudgment Interest.* Finally, Warde objects to the district court's award of $1.2 million in prejudgment interest. Warde complains that because the SEC was "ultimately responsible" for the nine-year delay in bringing the action, he should not be liable for the total amount of prejudgment interest.

The claim is without merit. As we recently held, "[e]ven if ... litigation was protracted through some fault of the SEC," the award of prejudgment interest for the entire period is proper because "defendant ... had use of unlawful profits for the entire period." *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1477 (2d Cir.1996). The award of prejudgment interest was plainly correct.

### Conclusion

The judgment of the district court is affirmed.