# United States Court of Appeals
## For the First Circuit

No. 00-1292

UNITED STATES,

Appellee,

v.

JOHN C. LARRABEE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Chief Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

John D. Donovan, Jr., with whom Jennifer A. Drohan and Ropes & Gray were on brief, for appellant.

Diane C. Freniere, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellee.

**BOWNES, <u>Senior Circuit Judge</u>.** The defendant, John C. Larrabee, was convicted of securities fraud after a jury trial and sentenced to twenty-one months imprisonment, followed by supervised release for a term of two years. He was also fined $20,000. On appeal, the defendant argues that his conviction should be reversed and his sentence vacated because the evidence was insufficient as a matter of law. Finding the evidence sufficient to support the conviction, we affirm the district court.

## I.

We describe the facts briefly here, but delve into them in greater detail where necessary for our discussion. Larrabee was employed as Director of Fiduciary Services by the Boston law firm of Bingham Dana & Gould ("Bingham Dana"). Larrabee, as Director of Fiduciary Services, controlled the selection of stockbrokers for the placing of securities trades on behalf of the trust accounts managed by Bingham Dana. D'Angelo was employed as a stockbroker by PaineWebber, Inc. and Larrabee directed a large share of Bingham Dana's business to D'Angelo. D'Angelo and Larrabee also shared a personal and financial relationship.

From almost December 7, 1995 until December 12, 1995, Bingham Dana represented Bank of Boston in connection with a potential merger with BayBanks. This was a highly confidential transaction. Though few attorneys at Bingham Dana were involved in the transaction, Larrabee had daily contact with at least one, John Brown. Brown visited Larrabee's office frequently to check stock prices and monitor Brown's personal account. Computer records indicate that Larrabee opened Brown's account summary on Larrabee's computer at 3:27 p.m. and 3:28 p.m. on December 12, 1995.

At 3:29 p.m., one minute after opening Brown's account summary, Larrabee placed a call to D'Angelo. The call lasted one minute and twelve seconds. Immediately after Larrabee's call, D'Angelo called his trading assistant, Krista Floramo, and entered orders to purchase approximately 11,000 shares of BayBanks stock, priced at $85 per share, for his own account and those of other family members and his girlfriend. When the trades were slow to be executed, he instructed Floramo to call a PaineWebber trader in New York to urge prompt execution. D'Angelo remained on the line until the trades were executed just prior to the market close at 4:00 p.m. This particular purchase and trading pattern was unusual for D'Angelo. This purchase was nearly twice as large as his previous trades.

-3-

Moreover, Floramo purchased 400 shares of BayBanks stock for her own account because of the unusual pattern of trades. To her knowledge, D'Angelo never had bought across all of his family accounts at once.

After the market closed on December 12, 1995, Bank of Boston and BayBanks announced their merger. As a result of the merger, BayBanks stock price increased by $8 per share before the market opened on December 13, 1995. Before the market opened on December 13, D'Angelo placed orders to sell all the shares he purchased the previous evening. D'Angelo realized a profit for those accounts of approximately $86,750.

PaineWebber attorneys questioned both D'Angelo and Floramo about those trades. D'Angelo attempted to speak with Floramo about her interview and unsuccessfully attempted to contact Larrabee. Larrabee and D'Angelo eventually spoke for approximately eight minutes on the morning of December 14, 1995. PaineWebber officials contacted a Bingham Dana attorney, Gerald Rath, to inform him of their suspicions and that Larrabee's name would likely surface in an SEC investigation. Bingham Dana attorneys then spoke with Larrabee about his contact with D'Angelo.

On June 30, 1998, a federal grand jury returned a nine-count indictment against co-defendants, John C. Larrabee and

James L. D'Angelo, charging each with securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a) and aiding and abetting in violation of 18 U.S.C. § 2. The defendants were tried separately and both were found guilty on all counts. Both filed notices to appeal, but D'Angelo has since withdrawn his appeal.

Larrabee seeks to reverse his conviction, arguing that "[t]he evidence was not sufficient to prove beyond a reasonable doubt that Larrabee 'appropriated' material nonpublic information such that he could have '*mis*appropriated' that information." (italics in original). He further argues that "[t]he evidence was not sufficient to prove beyond a reasonable doubt that Larrabee 'misappropriated' material nonpublic information for 'use' in 'connection with the purchase or sale of a security."

**II.**

At the conclusion of the government's case, the defendant moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29(a). The defendant failed, however, to renew his motion at the close of his case, as is required. See United States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992) (when the defendant does not renew its motion for acquittal, it is considered waived). The jury returned a verdict against the defendant; the defendant now challenges the sufficiency of the evidence. Because the defendant failed to renew his challenge after the close of the evidence, we review his challenge on appeal for clear and gross injustice. United States v. Stein, 233 F.3d 6, 20 (1st Cir. 2000); United States v. Santiago, 83 F.3d 20, 23 (1st Cir. 1996); Concemi 957 F.2d at 950. Even if the challenge were adequately presented, the evidence is more than sufficient to rationally support the verdict.

On appeal, we must determine whether the evidence,

> taken in the light most favorable to the government--a perspective that requires us to draw every reasonable inference and to resolve credibility conflicts in a manner consistent with the verdict--would permit a rational trier of fact to find each element of the crimes charged beyond a reasonable doubt.

United States v. Santana, 175 F.3d 57, 62 (1st Cir. 1999); Santiago, 83 F.3d at 23. This burden can be met by "either

-6-

direct or circumstantial evidence, or by any combination thereof." Santiago, 83 F.3d at 23; see also United States v. Sargent, 229 F.3d 68, 75 (1st Cir. 2000) ("[A] plaintiff is not required to produce direct evidence:  circumstantial evidence . . . is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given under the circumstances within which it unfolds.") (internal quotation marks omitted); United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995) ("[P]roof may lay entirely in circumstantial evidence.").

The government brought this case under a misappropriation theory of insider trading.  See United States v. O'Hagan, 521 U.S. 642 (1997).  Under a misappropriation theory,

> a person commits a fraud "in connection with" a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information. Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of the information. . . .  [T]he misappropriation theory outlaws trading on the basis of nonpublic information by a corporate "outsider" in breach of a duty owed not to a trading party, but to the source of the information.

Id. at 652-53 (internal citation omitted). This can be, and often is, proven by circumstantial evidence. See, e.g., Sargent, 229 F.3d at 74-75. After careful review of the entire record, we find that the evidence was sufficient for a jury to conclude beyond a reasonable doubt that Larrabee possessed material, nonpublic information concerning a merger between Bank of Boston and BayBanks and that he conveyed that information to D'Angelo, a stockbroker, with whom he had a close personal and financial relationship.

The defendant argues that proof of "opportunity" or "access" to material, nonpublic information is not the same as proving actual possession. That is correct, but does not carry the day. While the defendant is correct that opportunity alone does not constitute proof of possession, opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades, creates a compelling inference of possession by the tipper. See, e.g., SEC v. Warde, 151 F.3d 42, 46-49 (2d Cir. 1998); SEC v. Singer, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992); SEC v. Musella, 578 F. Supp. 425, 440-41 (S.D.N.Y. 1984).

After reviewing the record, and "resolving all doubts and credibility issues in favor of the [government]," Sargent,

229 F.3d at 75, we find that there was compelling evidence for a jury to determine that Larrabee possessed material, nonpublic information.  We examine myriad factors, including (1) access to information; (2) relationship between the tipper and the tippee; (3) timing of contact between the tipper and the tippee; (4) timing of the trades; (5) pattern of the trades; and (6) attempts to conceal either the trades or the relationship between the tipper and the tippee.

The evidence presented at trial, when pieced together, painted a picture which allowed the jury to conclude beyond a reasonable doubt that Larrabee possessed material, nonpublic information about the Bank of Boston-BayBanks merger.  Larrabee had the opportunity to access the information.  See Sargent, 229 F.3d at 76 (tipper had access to the information because he shared a small office with the source of the confidential information).  Larrabee was the Director of Fiduciary Services at Bingham Dana.  Beginning on December 7, 1995, Bingham Dana represented Bank of Boston in connection with a potential merger with BayBanks.  This was a highly confidential transaction, with only eight attorneys involved.  Two of those eight attorneys, John Brown and Donald Abrams, worked on the seventeenth floor, as did Larrabee.  Copies of documents pertaining to the bank merger were left in their "IN" boxes, located in the main

hallway of the floor and copies were made in the copying room located across from Larrabee's office. The names of the banks involved in the merger were often substituted with code names, but eventually documents were circulated with the correct party names.

Larrabee had daily contact with John Brown. Brown visited Larrabee's office frequently to check stock prices and monitor Brown's personal account. Computer records indicate that Larrabee opened Brown's account summary on Larrabee's computer at 3:27 p.m. and 3:28 p.m. on December 12, 1995. Brown testified that he did not recall telling Larrabee about the bank merger, but admitted that he could not "say with absolute certainty that [he] didn't say something inadvertently" to Larrabee.

While Larrabee's access to the information is not enough to prove that he actually possessed it, when we look further, the inferences taken as a whole, are compelling. First, we note the relationship between Larrabee and D'Angelo. See Warde, 151 F.3d at 45, 48-49 (tipper and tippee had close personal friendship); Musella, 578 F. Supp. at 441 (tipper and tippee were close personal friends). Larrabee and D'Angelo share a personal, financial and professional relationship. Larrabee and D'Angelo had been friends for a long time and their

families had spent various weekends, holidays and vacations together. For example, the two families celebrated many New Year's Eves together, including the year prior to this transaction. The Larrabees had an "open invitation" to D'Angelo's vacation home and visited it both with D'Angelo and without him.

The two men also shared a financial relationship. There is evidence in the record that D'Angelo made various payments to Larrabee either directly or indirectly. For example, D'Angelo gave the Larrabee children monetary Christmas presents. The record indicates that D'Angelo made some college tuition payments for Larrabee's children and wrote a check for $1,600 payable to Larrabee's Fidelity Investments account. The two college tuition payments for Larrabee's son totaled almost $23,500, and were made by bank check. A payment of $4,403 was made for the daughter's tuition. Larrabee did not disclose this financial relationship, in violation of Bingham Dana's conflict of interest policy.

Their relationship also had a professional component. Larrabee, as Director of Fiduciary Services, controlled the selection of stockbrokers for the placing of securities trades on behalf of the trust accounts managed by Bingham Dana. The evidence shows that Larrabee directed a large share of Bingham

-11-

Dana's business to D'Angelo. In fact, Larrabee estimated that he gave seventy-five to eighty percent of Bingham Dana's business to D'Angelo. Bingham Dana was D'Angelo's largest client.

The timing of the events is also significant. See Warde, 151 F.3d at 47-48 (timing of purchases coincided with contact between tipper and tippee); Adler, 137 F.3d 1325, 1340 (11th Cir. 1998) (suspicious timing of phone calls and trades); cf. SEC v. Truong, 98 F. Supp. 2d 1086, 1097-99 (holding that there was no insider trading when, inter alia, trading did not occur immediately after the calls, but throughout the following week); see also Musella, 578 F. Supp. at 441 (timing of trades significant). Here, the evidence shows that Larrabee opened the account summary of John Brown at 3:27 p.m. and 3:28 p.m. on December 12, 1995. One minute later, at 3:29 p.m., Larrabee called D'Angelo. The call lasted one minute and twelve seconds. Immediately thereafter, D'Angelo called his trading assistant, Krista Floramo. They spoke for fourteen minutes and D'Angelo placed an order for approximately 11,000 shares of BayBanks stock.

The pattern of the stock purchase is another piece in the puzzle. See Sargent, 229 F.3d at 73 (largest investment of the year); Warde, 151 F.3d at 48 ("uncharacteristic, substantial

-12-

and exceedingly risky investments" suggested insider trading); Musella, 578 F. Supp. at 441 (unusual trade pattern). Immediately after Larrabee called D'Angelo on December 12, 1995, D'Angelo called his trading assistant, Floramo, and entered orders to purchase approximately 11,000 shares of BankBanks stock, priced at $85 per share, for his own account and those of other family members and his girlfriend. D'Angelo purchased approximately $870,048 worth of BayBanks stock. This purchase was nearly twice as large as any of his previous trades. Immediately after talking with D'Angelo, Floramo called her husband and then purchased 400 shares of BayBanks stock for her personal account.

When the trades were slow to execute, D'Angelo instructed Floramo to call a PaineWebber trader in New York to urge prompt execution. Floramo testified that she did not recall any other time, in all the years that she worked for him, when D'Angelo asked her to do this. D'Angelo remained on the line until the trades were executed just prior to the close of the market at 4:00 p.m. Floramo testified that this trade was unusual for D'Angelo: i.e., the amount of shares and the fact that they were purchased for his family accounts.

After the market closed on December 12, 1995, BayBanks and Bank of Boston announced their merger. BayBanks' stock

would be converted into shares of Bank of Boston. As a result, BayBanks stock price increased $8 per share before the market opened on December 13, 1995. Before the market opened on December 13th, D'Angelo placed orders to sell all of the shares he purchased the previous evening. D'Angelo, his family and girlfriend realized a profit for those accounts of approximately $86,750.

We also find significant the efforts of D'Angelo and Larrabee to conceal their relationship and the purchases made by D'Angelo. See Warde, 151 F.3d at 47 ("[Defendant's] resort to deceptive trading practices supports an inference that he was trading illegally on insider information."). The afternoon after Bank of Boston and BayBanks announced their merger, Eric Selzer, managing attorney at PaineWebber, contacted D'Angelo to inquire why D'Angelo purchased BayBanks stock the previous day. They spoke for approximately thirty minutes. D'Angelo then informed Floramo that he had been questioned by PaineWebber attorneys and that she might be questioned as well. Thereafter, the PaineWebber attorney called Floramo to discuss D'Angelo's trading of BayBanks stock. The call lasted from five to ten minutes.

After work, Floramo contacted her own attorney. That evening, Floramo arrived home to find three messages from

-14-

D'Angelo. Floramo returned his call. D'Angelo asked her about her conversation with the PaineWebber attorney, but she responded that she could not speak to him on the matter. D'Angelo asked her to meet him for coffee the following morning at the Mobil Mart next to the office. He had never asked her to do this before. She agreed, but instead went directly to work.

D'Angelo attempted to contact Larrabee at home during the evening of December 14. Phone records indicate that Larrabee called D'Angelo at work on the morning of December 14 and the two spoke for approximately eight minutes. D'Angelo called Larrabee again that evening at home at approximately 9:00-9:30 p.m. Larrabee told D'Angelo that he could not talk and hung up.

The PaineWebber attorney contacted D'Angelo again in the morning on December 14. The attorney then called Gerald Rath, a partner at Bingham Dana, to give him "a heads up." The PaineWebber attorney informed Rath that Bingham Dana would likely receive other calls regarding the D'Angelo trades, particularly from the SEC. The PaineWebber attorney then described his suspicions about D'Angelo and Larrabee.

Later that afternoon, Rath and Bingham Dana managing partner, Jay Zimmerman, met with Larrabee. When asked about his relationship with D'Angelo, Larrabee told them about their

professional relationship.  Rath testified that he was made to believe that Larrabee and D'Angelo were not close friends but they shared "an occasional social relationship."  Rath directly asked Larrabee about any financial relationship--whether there were any checks or money back and forth.  Larrabee responded that there was nothing of value with the exception of one $100 Christmas gift from D'Angelo to Larrabee's children.  Larrabee did not mention any of the other payments made by D'Angelo.  Rath also questioned Larrabee about recent contact that he had with D'Angelo.  Rath directly asked Larrabee when the last time he spoke with D'Angelo.  Larrabee responded that it was sometime earlier in the week.  In reality, it was earlier that morning.

We find that there was compelling evidence for a jury to determine that Larrabee possessed material, nonpublic information:  Larrabee's access to the information;  the relationship between Larrabee and D'Angelo;  the timing of the contacts between Larrabee, D'Angelo and the trades;  the pattern of the trades;  and the attempts by Larrabee and D'Angelo to conceal the trades and their relationship with each other.  When assembled, the pieces of the puzzle create a picture that supports the inference that Larrabee did possess material, nonpublic information about the bank merger.

-16-

The defendant also argues that "the evidence of Mr. Larrabee's 'use' of any 'appropriated' information was insufficient to establish '*mis*appropriation' beyond a reasonable doubt." (Italics in original). The defendant contends that the evidence was insufficient for the jury to infer that Larrabee's tip to D'Angelo was intended for use in connection with the purchase or sale of a security. The second requirement of an insider trading violation is that "the misappropriator's deceptive use of information be in connection with the purchase and sale of [a] security." O'Hagan, 521 U.S. 642, 655-56 (alteration in original) (internal quotation marks omitted).

Larrabee argues that even assuming arguendo that he did possess the material, nonpublic information, the evidence is insufficient for a jury to infer that he gave that information to D'Angelo with the intent that D'Angelo use that information to purchase or sell securities. We disagree. The circumstantial evidence detailed above more than adequately supports the conclusion that Larrabee intended that D'Angelo use the information for purchase or sale of the security.

> The tipper's knowledge that he or she was breaching a duty to the owner of confidential information suffices to establish the tipper's expectation that the breach will lead to some kind of misuse of the information. This is so because it may be presumed that the tippee's interest in

the information is, in contemporary jargon, not for nothing.

Sargent, 229 F.3d at 77 (quoting United States v. Libera, 989 F.2d 596, 600 (2d Cir. 1993)).

### III.

Based on our review of the entire record, we find that there was sufficient evidence for the jury to conclude beyond a reasonable doubt that the defendant appropriated material, nonpublic information and then misappropriated that information for use in connection with the purchase or sale of a security. There was no clear and gross injustice, and the defendant's conviction is, therefore, **affirmed**.