SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Arjun SEKHRI, et al., Defendants.

No. 98 Civ. 2320(RPP).

United States District Court, S.D. New York.

Sept. 8, 2004.

Kenneth J. Guido (KG 3470), Paul A Gumagay (PG 0805), Securities and Exchange Commission, Washington, DC, for Plaintiff.

Maranda E. Fritz, New York City, for Defendant.

## OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.

In this action brought against Arjun Sekhri and others, the Securities and Exchange Commission ("SEC") alleges violations of Section 10(b) and 14(e) of the Securities Exchange Act of 1934 and Rules 10b–5 and 14e–3. The SEC moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") against defendant Amolak Sehgal ("Sehgal"). Sehgal is the father-in-law of Arjun Sekhri ("Sekhri"), an employee of Salomon Brothers ("Salomon") who pled guilty in this Court on March 14, 2000 to engaging in an insider trading scheme involving the common stock or stock options of MCI Communications Corp. ("MCI"), Carson Pirie Scott & Co., Inc. ("CPS"), Southern New England Telecommunications Corp. ("SNET"), and others in violation of Section 10(b) and 14(e) of the Securities Exchange Act of 1934 and Rules 10b–5 and 14e–3.

## I. Background

The SEC's case rests upon 1) the plea allocution of Sekhri in his criminal case, 2) the timing of phone calls between Sekhri's home and Sehgal's home and the securities transactions of Sehgal, and 3) money transfers in and out of Sehgal's account.

On March 14, 2000, Sekhri pled guilty to an information filed in federal district court charging the ·crimes of conspiracy to

commit securities fraud, securities fraud (15 U.S.C. §§ 17j(b), 78ff and 17 C.F.R. § 240.10b–5) and fraud in connection with a tender offer (15 U.S.C. §§ 78n(e), 78ff and 17 C.F.R. § 240.14e–3(a)). (Second Declaration of Paul A. Gumagay, Ex. A, Information.) The conspiracy count charged *inter alia* that during the period July 29, 1996 to January 21, 1998, Sekhri was employed by Salomon (*id.* at ¶ 1), that Salomon had as clients, SNET, Proffitt's Inc., and WorldCom, each of whom engaged in mergers or tender offers with, respectively, SBC Communications, CPS and MCI (*id.* at ¶ 21). The information further alleges that during that period Sekhri passed confidential information about the mergers and tender offer to Fuad Dow, Co–Conspirator I,[1] Co–Conspirator II, and Co–Conspirator III. (*Id.* at ¶ 38.) The second count alleged securities fraud in violation of Rule 10b–5 in connection with the purchase and sale of securities in or issued by *inter alia* MCI, CPS, and SNET. (*Id.* at ¶¶ 70–71.) The third count of the information alleged that Sekhri purchased and sold securities and options which were sought by WorldCom without publicly disclosing the information and its source and before it became public that WorldCom was commencing a tender offer for MCI. (*Id.* at ¶¶ 72–73.)

Sekhri acknowledged that he was guilty of all three counts and allocated as follows:

From July 1996 to January 1998, I was employed as an associate at Salomon Smith Barney, Inc. and had access to confidential market-sensitive inside information about pending business transactions, including mergers. During that period I unlawfully disclosed this confidential information to Fuad Dow, Sherid Kapoor, Martin Thifault and others. In connection with that information, I am aware that these individuals traded on their accounts and I shared in a portion of the proceeds received by Mr. Dow.

(Second Declaration of Paul A. Gumagay, Ex. B, Tr. Hr'g 3/14/2000 at 20 [hereinafter Plea Hr'g].)

The case of the SEC against Sehgal is based on the timing of Sehgal's purchases of stocks or options in companies which were participants in three business transactions in which Salomon acted as financial advisor and on the telephone records of calls made in close proximity to Sehgal's purchases. The first transaction in question occurred shortly before WorldCom's announcement of a tender offer for MCI on October 1, 1997. Salomon was a financial advisor to WorldCom and Sekhri was a member of the deal team. (Pl.'s 56.1 Stmt.[2] at ¶ 23.) The price of MCI's stock rose almost six dollars a share following the October announcement. (*Id.*)

On the evening of September 16, 1997, two weeks prior to the October 1st an-

---

1. The information states that Co–Conspirator I is a resident of Stormville, New York, and is related by marriage to Sekhri. (Second Declaration of Paul A. Gumagay, Ex. A, Information at ¶ 3.) Sehgal is a resident of Stormville, New York (Sixth Declaration of Paul A. Gumagay, Ex. B) and is the father-in-law of Sekhri (Def.'s 56.1 Stmt. at ¶ 1). Sehgal admitted in papers opposing a previous motion to being the person identified in the information as Co–Conspirator I. (Mem. Opp. Mot. SEC Compel Disc. & Supp. Cross Mot. Protective Order at 5); *see S.E.C. v. Sekhri et al,* No. 98cv2320, 2002 WL 31654969, at *1 (S.D.N.Y. Nov.22, 2002).

2. Pl. SEC's Local Rule 56.1 Statement of Material Facts as to Which there are No Genuine Issues of Fact to be Tried Against Def. Amolak Sehgal [hereinafter Pl.'s 56.1 Stmt.]. This citation and the citations to Pl.'s 56.1 Stmt. that follow are not controverted by the Local Rule 56.1 Statement submitted by Sehgal. Accordingly, they are deemed to be admitted by Sehgal for purposes of this motion. *See* Local Rule 56.1(c).

nouncement, four phone calls were exchanged between Sehgal's home and Sekhri's home. (*Id.* at ¶ 14.) The next day, on September 17, 1997, Sehgal and his wife opened a brokerage account at A.G. Edwards. (*Id.* at ¶ 15.) On the evening of September 18, 1997, three phone calls were exchanged between the Sehgal and Sekhri homes. (*Id.* at ¶ 16.) On September 19, 1997, Sehgal deposited $30,000 of his personal funds and a $120,000 line of credit secured by his personal residence into the new A.G. Edwards account. (*Id.* at ¶ 17.) Sehgal admitted at his deposition that he moved the funds to the A.G. Edwards account for the purpose of buying MCI shares. (*Id.*) On September 19th, Sehgal bought 3,000 shares of MCI for $86,815.50. (*Id.* at ¶ 18.)

On November 10, 1997, MCI announced that it had accepted an increased bid from WorldCom. (*Id.* at ¶ 39.) The price of MCI stock increased over four dollars a share following this announcement. (*Id.*) On November 6, 1997, four days before the announcement, Sehgal made a second purchase of shares in MCI, on margin. (*Id.* at ¶¶ 37–38.) Just over ten minutes before the purchase of the additional MCI shares, Sehgal's liquor store received a call from a payphone in New York City billed to Sekhri's calling card. (*Id.* at ¶ 37.) When Sehgal sold his MCI shares on January 27, 1998, he realized profits of $39,361.64 from his September 18th purchase (*id.* at ¶ 25) and $24,469.81 from his November 6th purchase. (*Id.* at ¶ 41.)

The next transactions concern the agreement on October 29, 1997 of Proffitt's, Inc. to acquire CPS. Salomon was a financial adviser to Proffitt's. (*Id.* at ¶ 34.) On October 19, 1997, ten days prior to announcement of the agreement, Sehgal opened an account at Discover Brokerage. (*Id.* at ¶ 27.) On October 26, 1997, twelve phone calls were exchanged between the

Sekhri and Sehgal home telephones. (*Id.* at ¶ 28.) On October 27, 1997, Sehgal deposited $2,000 into the Discover brokerage account. (*Id.* at ¶ 29.) On that same day, five phone calls were exchanged between Sekhri's and Sehgal's home between 7:59 p.m. and 11:03 p.m. (*Id.*) The following day, October 28, 1997, Sehgal wired $60,000 from an account of his at First Union account to his Discover brokerage account and purchased 3,300 shares of CPS on margin for $123,153.50. (*Id.* at ¶ 30–31.) On October 29, 1997, the day Proffitt's Inc. announced its agreement to acquire CPS, four phone calls were exchanged between Sekhri's house and Sehgal's store or Sehgal's house. (*Id.* at ¶¶ 34–35.) On October 30, 1997, the day after the Proffitt's announcement, Sehgal sold 3,300 shares of CPS and made a profit of $24,450.57. (*Id.* at ¶ 36.)

The final transaction in question involves the January 5, 1998 announcement of SBC Communications Inc. that it had agreed to merge with SNET. Salomon was a financial adviser to SNET. (*Id.* at ¶ 45.) On December 29, 1997, two five-minute phone calls were exchanged between the Sekhri and Sehgal homes, one at 5:03 p.m. and one at 9:36 p.m. (*Id.* at ¶ 42.) On January 2, 1998, Sehgal purchased $18,580.25 worth of shares of SNET on margin. (*Id.* at ¶ 43.) Immediately following the merger announcement, Sehgal sold his SNET shares realizing profits of $3,585.01. (*Id.* at ¶ 46.)

The SEC also points to four money transfers which involved Sehgal during the period in question. First, on September 23, 1997, during the period before the MCI announcement, Sehgal transferred $70,000 from his First Union account to the Swiss bank account of Konrad Ebert. (*Id.* at ¶ 21.) Konrad Ebert was a friend of Sekhri's father and maintained a brokerage

account for Sekhri's father (*id.;* Def.'s 56.1 Stmt.[3] at ¶ 19).

Second, on October 10, 1997, Sehgal received a $80,545 wire transfer from Gordon W. Cochrane, a defendant in this suit to recover profits made, who also pleaded guilty to one count of conspiracy to commit securities fraud with Sekhri (*See United States v. Cochrane,* 98 Cr. 740 (S.D.N.Y. July 16, 1998).) (Pl.'s 56.1 Stmt. at ¶ 24; Def.'s 56.1 Stmt. at ¶ 20.)

Third, on or about November 25, 1997, after Sehgal had profited from his sale of CPS stock, Sehgal issued a check for $15,000 to Lexus of Manhattan (Def.'s 56.1 Stmt. at ¶ 21) as a down payment on a 1998 GS 400 Lexus automobile purchased by the parents of Sekhri, but used by Sekhri. (Pl.'s 56.1 Stmt. at ¶ 40.)

On January 3, 1998, during the business transaction between SNET and SBC, $54,000 was deposited in First Union account of Sehgal. (*Id.* at ¶ 44.) The check was drawn from Sekhri's account and signed by Sekhri's wife, Vanita. (*Id.*)

In his deposition, of January 15, 2003, Sehgal denied having any conversations over the phone regarding any stock, any company or any securities with either his daughter (Vanita) or Sekhri. (Affirmation of Maranda Fritz, Ex. 3, Dep. of Amolak Sehgal 1/15/2003 at 34–35 [hereinafter Sehgal Dep.].) When confronted with the phone records at the deposition, Sehgal maintained that they were all calls between his wife and Vanita. (*Id.* at 130.) He testified that he never had substantive telephone conversations with Sekhri. (*Id.* at 131.) He testified that he worked at the liquor store he owned about fourteen hours a day and returned home around 9:30 or 10:00 at night. (*Id.* at 146–47.) Sehgal points out that phone records indicate that many of the calls made between the Sekhri and Sehgal homes were made before Sehgal returned from the liquor store.[4] Counsel points out that phone records for the Sekhri home show phone calls from Sekhri's home to Sekhri's office during the time the SEC suggests Sekhri was calling Sehgal from home. For example, on September 16, 1997 at 8:23 p.m. a one-minute phone call was placed from Sekhri's home number to his office number. (Sixth Decl. Paul A. Gumagay, Ex. A (phone records of Arjun Sekhri).)[5]

As for his familiarity with Sekhri's work at Salomon, Sehgal denied knowing anything about Sekhri's position at Salomon. (Sehgal Dep. at 17.) He admits that as of 1997, he knew that Salomon Brothers was in the securities business and "they were related to the stock market," but according to Sehgal, he did not know what work Sekhri did for Salomon and he did not know that Sekhri had signed a confidentiality agreement with Salomon. (*Id.* at 19–21.) Sehgal states that he was not aware that Sekhri was in the mergers and acquisitions group and had access to non-public information. (*Id.* at 21–22.) With respect to his knowledge of the work that Sekhri did, Sehgal stated, "I knew he had, number one, MBA; number two, he was

---

**3.** Def.'s Statement of Material Facts Pursuant to Local Civil Rule 56.1 [hereinafter Def.'s 56.1 Stmt.].

**4.** On September 16, 1997, in particular, Sehgal's brief contends, without citation to the record, that he closed his cash register at 7:59 p.m., therefore he was not home for "all or some of those calls" the SEC cites. (Mem. Opp. Mot. Summ. J. SEC at 3; *see also* Def.'s

56.1 Stmt. at ¶ 5) A motion for summary judgment must be based on evidence in the record. Fed.R.Civ.P. 56(e). Accordingly, these statements are disregarded.

**5.** Counsel infers that Sekhri could not have made the call from Sekhri's home to Sehgal's home at 8:28 p.m. that night. (Mem. Opp. Mot. Summ. J. SEC at 4.)

working for Salomon Brothers, who definitely were in the securities business." (*Id.* at 30.)

He points out that he had some past experience trading stocks in an account he had with Merrill Lynch and in a brokerage account with a small, discount firm. (*Id.* at 15.) On April 29, 2003, Sehgal's attorney supplied the SEC with copies of Sehgal's notes, articles from *The New York Times* and *Forbes* regarding MCI's merger plans, and a January 22, 1998 mailing to MCI shareholders. (*See* Affirmation of Maranda Fritz, Ex. 2, letter from Maranda Fritz to Paul Gumagay of 4/29/2003.)

*MCI Purchases*

As regards to his reasons for purchasing MCI stock, Sehgal testified that because his liquor store was not doing well, he attempted to make some money in the stock market. (Sehgal Dep. at 27–28.) He started researching on his own, and then discussed MCI with many people including Sekhri. (*Id.* at 29.) Sehgal testified when Sekhri visited him at Sehgal's residence, two weeks before September 19, 1997 (*id.* at 32–33), he asked Sekhri what he thought of MCI, and Sekhri replied, " 'It's a good company, there are good possibilities,' " (*id.* at 29, 33). He admitted that his purchase of MCI stock on September 24, 1997 was his largest stock purchase up until that date. (*Id.* at 38.) But, Sehgal testified that from August 22, 1997 up to and including October 1, 1997, Sekhri did not tell him about WorldCom's plans to acquire MCI. (*Id.* at 62.) Sehgal testified that he did not have any discussions with Sekhri before his second purchase of MCI stock on November 6, 1997; that he only discussed it with his broker. (*Id.* at 81.)

He also denied that Sekhri ever gave him confidential information concerning MCI or WorldCom prior to his second purchase of MCI shares. (*Id.* at 82.) He testified that he sold his MCI shares in order to pay off the home equity loan that he had taken out.[6] (*Id.* at 83.)

*SNET Purchases*

With respect to SNET, Sehgal testified that he was disappointed in his Christmastime sales at the liquor store, so he considered becoming a full time day trader. (*Id.* at 86.) He went to the library to do some research and came upon a November 1997 *Money* magazine article that recommended SNET. (*Id.; see* Affirmation of Maranda Fritz, Ex. 2 at 15.) Sehgal did not recall hearing anything about a merger, (Sehgal Dep. at 89) and he denied trading on the stock of SNET based on information provided to him by Sekhri (*id.* at 91).

*CPS Purchases*

Sehgal testified that he first heard of CPS after a short, "face to face" discussion with Sekhri prior to the announcement. (*Id.* at 65–66.) According to Sehgal, the extent of the conversation was that when Sehgal brought up how poorly his own retail business was doing, Sekhri said " 'Wal–Mart is doing very good, and Carson is doing very good.' " (*Id.* at 66.) Sekhri then explained that CPS was located in the Midwest and that they were doing very well. (*Id.*) When Sehgal asked, Sekhri told him the company's ticker symbol. (*Id.*) Sehgal testified that he then did internet research and learned that some company was trying to acquire CPS. (*Id.* at 67.) He testified that he had notes from his research.[7] (*Id.* at 68.) He added

---

6. Sehgal also testified that in February and March of 1998, Sehgal traded on stock of other companies, including Timberline Software, Western Digital Corporation, Advanced Micro Devices, Intel Corporation and Wal–Mart. (Sehgal Dep. at 84–85.)

7. These notes were not submitted along with the other notes and articles pertaining to Seh-

that he was also researching Wal–Mart stock at the time, though he did not purchase any of their stock. (*Id.*) He testified that he did not discuss the sale of the CPS stock with anyone but his broker. (*Id.* at 77.) He asserted that he did not know that CPS stock went up; he asked his broker to sell it because he needed money for his store. (*Id.* 77–78.) He also testified that Sekhri did not provide him with confidential information regarding Proffitt's Inc. and/or CPS. (*Id.* at 79.)

*Money Transfers*

As to the money transfers cited by the SEC, Sehgal testified that, through his wife, he heard that Sekhri had requested a loan. (*Id.* at 50.) As requested by Sekhri, he then transferred $70,000 to the Swiss bank account of Konrad Ebert, whom he had met briefly at his son's wedding and knew to be friends with Sekhri's parents. (*Id.* at 52, 55.) Three weeks later when $80,545 was wired to his bank account by Gordon Cochrane, Sehgal assumed it was in repayment for the loan. (*Id.* at 56.)

With respect to the $15,000 for the purchase of the Lexus, Sehgal testified that his daughter sent a check for $15,000 to be deposited in a joint account she had with her mother. (*Id.* at 109.) A few days later, Vanita requested a check for the same amount made out to Lexus of Manhattan. (*Id.*) He testified that he did not recognize it as the name of a car dealership: "This may sound very funny to you, but again, Lexus of Manhattan, I personally didn't recognize this was a car, honest to God." (*Id.* at 113.)

## II.  Applicable Law

### A.  Standard for Summary Judgment Motion

According to Fed.R.Civ.P. 56, in order to defeat a motion for summary judgment,

gal's research on April 29, 2003.

the adverse party (here Sehgal) "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor." *S.E.C. v. American Board of Trade, Inc.,* 750 F.Supp. 100, 103–04 (S.D.N.Y.1990). Summary Judgment is usually inappropriate where state of mind is implicated. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). The court reviews all the evidence submitted, such as affidavits and depositions, and any ambiguities are to be resolved against the movant. *American Board of Trade,* 750 F.Supp. at 103.

### B.  The Alleged 10(b) and Rule 10b–5 violations

■   Section 10(b) of the Exchange Act and Rule 10b–5 prohibit the fraud or deceit by any person in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. This includes trading on inside, non-public information. 17 C.F.R. § 240.10b–5–1; 17 C.F.R. § 240.10b–5–2. Under the misappropriation theory of insider trading, the tipper breaches his or her fiduciary duty to the source of the information by disclosing material, non-public information. *See United States v. O'Hagan,* 521 U.S. 642, 652, 117 S.Ct. 2199, 2207, 138 L.Ed.2d 724 (1997); *Dirks v. S.E.C.,* 463 U.S. 646, 655 n. 14, 103 S.Ct. 3255, 3262 n. 14, 77 L.Ed.2d 911 (1983).

Insider trading in violation of section 10(b) and Rule 10b–5 requires proof of the following five elements: (i) that the tipper possessed material, nonpublic information regarding a security's issuer; (ii) the tipper disclosed this information to the tippee; (iii) the tippee traded in

the issuer's securities while in possession of the information; (iv) the tippee knew or should have known that the information was disclosed in violation of a relationship of trust; and (v) the tipper benefitted by the disclosure to the tippee.

*S.E.C. v. Palermo*, 99cv10067, 2001 WL 1160612, 2001 U.S. Dist. LEXIS 15424, at * 7 (S.D.N.Y. Oct. 2, 2001) (citing *S.E.C. v. Warde*, 151 F.3d 42, 47 (2d Cir.1998)).

## C. The Alleged 14e–3(a) Violation

"One violates Rule 14e–3(a) if he trades on the basis of material non-public information concerning a private tender offer that he knows or has reason to know has been acquired 'directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf." *O'Hagan*, 521 U.S. at 669, 117 S.Ct. 2199 (quoting *United States v. Chestman*, 947 F.2d 551, 557 (1991) (en banc), *cert. denied*, 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992)). The private tender offer in this case is WorldCom's tender offer for MCI first announced on October 1, 1997.

## III. Discussion

The SEC maintains that by pleading guilty to Count I of the Information (Conspiracy to Commit Securities Fraud in violation of Rule 10(b)(5)), Sekhri admitted to providing non-public information to Co–Conspirator I. Because Co–Conspirator I is identified in the Information as a resident of Stormville, New York, and relation by marriage to Sekhri (Second Declaration of Paul A. Gumagay, Ex. A, Information at ¶ 3), the SEC maintains that Sekhri, in effect, admitted to providing non-public information to Sehgal. Sekhri, however, did not implicate Sehgal during his plea of guilty. In his plea allocution,[8] Sekhri admitted to unlawfully disclosing "confidential information to Fuad Dow, Sherid Kapoor, Martin Thifault and others." (Plea Hr'g at 20.) Sekhri did not mention Sehgal.

The SEC contends that the phone calls between the homes of Sekhri and Sehgal immediately prior to the trades in question are circumstantial evidence indicating that Sekhri was passing along confidential information to Sehgal.

Sehgal does not dispute that through his work at Salomon, Sekhri had access to material, non-public information regarding WorldCom's tender offer for MCI, the acquisition of CPS by Proffitt's Inc., and the merger between SNET and SBC Communications. (*See* Pl.'s 56.1 Stmt. at ¶ 7; Def.'s 56.1 Stmt. at ¶ 11.) In his deposition, however, Sehgal denied having any conversation over the phone regarding any stock, any company, or any securities with either his daughter or his son-in-law. (Sehgal Dep. at 34–35.) Sehgal does admit to discussing MCI and CPS stocks with Sekhri, but maintains that these conversations occurred in-person. (*Id.* at 33, 65–66.) Sehgal states that Sekhri's comments regarding MCI were limited to, "It's a

---

**8.** The plea allocution of a criminal case involving securities fraud is admissible in a related civil case. *Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, No. 94cv2727, 1997 WL 906427, at * 4 n. 7 (S.D.N.Y. Sept.12, 1997). The evidence admitted, however, is not conclusive. The party against whom the conviction is being used may still rebut it, and a fact finder can determine what weight to give the plea. *Banks Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93cv6874, 2001 WL 99506, at *3 (S.D.N.Y. Feb.6, 2001) (citing 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.28[4], at 803–131 (Joseph B. McLaughlin 2d ed.2000)). The recent Supreme Court case *Crawford v. Washington*, —— U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), is inapplicable here, because in *Crawford* the constitutional right in question was the right to confront witnesses in a criminal trial. *See* U.S. Const. Amend. VI.

good company, there are good possibilities." (*Id.* at 29.) Sekhri's comments regarding CPS were limited to "Carson is doing very good," and then providing Sehgal with the ticker symbol. (*Id.* at 66.) Sehgal asserts that he conducted further research on his own before making investment decisions. (Sehgal Dep. at 67, 80–82, 86–88.) Sehgal has supplied the articles upon which he relied and notes he took when making his investment decisions. (*See* Affirmation of Maranda Fritz, Ex. 2, letter of Maranda Fritz to Paul Gumagay of 4/29/2003 (enclosing articles from August and December 1997 issues of Valuline; articles from *The New York Times* regarding the MCI–British Telecom merger from July and August 1997; a January 22, 1998 mailing to stockholders from MCI; clippings from *Business Week;* an article from the November 1997 issue of *Money* recommending SNET; handwritten notes about MCI, clippings from the April 21, 1997 issue of *Forbes;* and typewritten notes about MCI and SNET based on the December 29, 1997 issue of *Business Week.*))

Although the SEC's circumstantial evidence is strong, it is insufficient to grant summary judgment against Sehgal. Sehgal testified that Sekhri did not pass on confidential information to him about any of the business transactions in which Salomon was involved. Accordingly, because there is a genuine issue of fact regarding the second element of the Rule 10b–5 cause of action, *i.e.*, whether the tipper disclosed material non-public information to the tippee, it is unnecessary to determine if there is a genuine issue of material fact with respect to the other three elements. Additionally, because there is a genuine issue of material fact as to whether Sehgal received material, non-public information concerning WorldCom's tender offer for MCI, summary judgment on the Rule 14e–3 claim is denied as well.

IT IS SO ORDERED.